**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JOHN LAMSON,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,<br><br>Defendant. | CASE NO. 5:25-CV-01622-AMK<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff John Lamson seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF Doc. 7.)

For the reasons set forth below, the Court **AFFIRMS** the Commissioner's final decision.

## I. Procedural History

Mr. Lamson filed his DIB application on January 19, 2023, alleging a disability onset date of June 16, 2016. (Tr. 228.) He alleged disability due to coronary artery disease ("CAD"), cervical disc disease, left knee arthritis, right shoulder arthritis, poor stress tolerance, kidney dysfunction, anemia, and hypertension. (*Id.*) His claims were denied at the initial level (Tr. 233) and upon reconsideration (Tr. 234), and he requested a hearing (Tr. 253). An Administrative Law Judge ("ALJ") held a telephonic hearing on June 10, 2024 (Tr. 203-27) and thereafter issued an unfavorable decision on July 16, 2024 (Tr. 158-76). Mr. Lamson requested review by

the Appeals Council, and his request was denied, making the ALJ's July 16, 2024 decision the final decision of the Commissioner. (Tr. 1-4.)

Mr. Lamson filed the instant Complaint on August 4, 2025 (ECF Doc. 1), raising the following assignment of error:

> The ALJ's finding that Plaintiff retained a Residual Functional Capacity for medium work is not supported by substantial evidence.

(ECF Doc. 10, p. 6.) The matter is fully briefed and ripe for decision. (ECF Docs. 10, 11.)

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Mr. Lamson was born in 1965 and was 51 years old on the June 26, 2016 alleged onset date, making him an individual closely approaching advanced age under Social Security regulations. (Tr. 228.) He was 57 years old on the December 31, 2022 date last insured, making him an individual of advanced age. (Tr. 170.) He had at least a high school education. (Tr. 429.) He performed some work after the alleged onset date. (Tr. 228.)

### B. Medical Evidence

#### 1. Relevant Treatment History[1]

On April 23, 2012, prior to the June 16, 2016 alleged onset date, Mr. Lamson underwent cervical fusion surgery at the C5-C6 and C6-C7 levels with cage placement to treat cervical disc herniation, cervical degenerative disc disease, and cervical stenosis. (Tr. 842-45.) Due to complications with the surgical hardware, he required revision surgery at both levels on December 28, 2012. (Tr. 817-20.) A May 2015 x-ray of the cervical spine showed a stable C5-C7 fusion. (Tr. 1554.) Neither party points to later dated imagery of the cervical spine.

---

[1] The summary of the medical evidence is generally limited to evidence cited by the parties that is from the alleged disability period and relevant to the legal and factual issues before the Court. Mr. Lamson must establish disability between the June 16, 2016 alleged onset date and the December 31, 2022 date last insured. (Tr. 163.)

Between July 26, 2016 and December 4, 2018, Mr. Lamson attended regular appointments with Justin T. Drummond, M.D., at Comprehensive Pain Management Specialists to treat neck and back pain. (Tr. 907-80.) He complained of constant neck and back pain that was aggravated with activity, but he also reported that medications were effective. (*See, e.g.,* Tr. 907, 919, 926, 929, 936, 944, 951, 960, 968, 975.) His physical examinations usually showed no acute distress, ability to rise from a seated position easily, tenderness to palpation in the cervical spine, mildly reduced cervical range of motion, normal range of motion in the thoracic spine, and normal gait, coordination, and strength in all four extremities. (*See, e.g.,* Tr. 907-08, 919-20, 926-27, 929-30, 936-37, 944-45, 951-52, 960-61, 968-69, 976.) Dr. Drummond diagnosed him with cervical spondylosis with radiculopathy, post laminectomy syndrome, cervical disc displacement, cervicalgia, and myalgia (*see* Tr. 927, 976) and consistently prescribed Flexeril and Norco (*see* Tr. 909, 921, 931, 938, 946, 953, 962, 970, 977).

Mr. Lamson continued treating regularly at Comprehensive Pain Management Specialists from May 2020 through May 2023 (*see* Tr. 1538-1640.) On May 5, 2020, he presented to Stephanite Whitling, PA-C for a follow up. (Tr. 1639-40.) He reported neck and back pain that was worse with activity and better with medications and rest. (Tr. 1639.) On physical examination, he was in no acute distress, he could easily rise from a seated position, he had mildly limited cervical range of motion, normal thoracic and lumbar range of motion, and normal strength, gait, coordination, and cranial nerves. (Tr. 1639-40.) PA-C Whitling assessed cervical spondylosis with radiculopathy, post laminectomy syndrome, cervical disc displacement, and cervicalgia. (Tr. 1640.) On March 23, 2021, Mr. Lamson reported constant neck and back pain that was worse with activity and helped by medication and rest. (Tr. 1597.) He also reported that he continued working full-time in "construction type business." (Tr. 1599.) His physical

examination showed ability to rise easily from a seated position, mildly limited extension and rotation of the cervical spine, and mild pain with facet loading, negative Spurling's and Hoffman's signs, and normal strength and gait. (Tr. 1598.) His reported symptoms and examination were unchanged on May 24, 2022, and he reported that medications allowed him to continue working in construction. (Tr. 1565-67.) On May 16, 2023, his reported symptoms and physical examination findings remained the same. (Tr. 1538-39.) He was taking hydrocodone and cyclobenzaprine HCL for pain and declined the recommended injections. (Tr. 1540.)

On May 7, 2021, Mr. Lamson presented at the Summa Health Hospital emergency room ("ER") complaining of 10/10 chest pain with diaphoresis. (Tr. 987.) He was admitted for treatment of a non-ST elevated myocardial infarction ("NSTEMI") and acute coronary syndrome. (Tr. 995, 1000.) On May 8, he underwent cardiac catheterization that showed NSTEMI due to ulcerated ruptured plaque of the ostial LAD and mild left ventricular systolic dysfunction with moderate apical hypokinesis consistent with stunned myocardium. (Tr. 1057-60.) On May 9, he was cleared for discharge in improved and stable condition. (Tr. 1000.)

On May 14, 2021, Mr. Lamson attended a cardiology appointment with Lori J. Cannady APRN-CNP, at Summa Health Medical Group. (Tr. 1089-97.) He did not report any anginal complaints and declined cardiac rehabilitation. (Tr. 1089.) His physical examination was normal. (Tr. 1092-93.) CNP Cannady diagnosed NSTEMI and left ventricular dysfunction (Tr. 1097), ordered an EKG, an Echo 2D Doppler, and a lipid panel (Tr. 1089), continued aspirin, Brilinta, and beta blockers (*id.*), and set a follow-up in three months (Tr. 1094).

In September 2021, Mr. Lamson underwent an echo that showed normalization of left ventricular function, and he reported no pain or shortness of breath. (Tr. 1081.) He followed up with Joseph D. Redle, M.D., in cardiology on September 13, 2021, and March 22, 2022. (Tr.

1073-88.) At both appointments, Mr. Lamson reported no anginal complaints and being "very active," working in construction work with no symptoms of chest pain or tightness. (Tr. 1073, 1081.) Physical examinations at both appointments were normal, including normal heart rate and rhythm with no murmur or gallop. (Tr. 1075-76, 1083-84.) Dr. Redle diagnosed hypertension, hyperlipidemia, left ventricular dysfunction, and CAD that was stable with no symptoms as of March 2022 and being treated with dual antiplatelet therapy. (Tr. 1078, 1086.)

On January 20, 2022, Mr. Lamson presented to his primary care doctor, Paul E. Fracasso, D.O., at AFL SPI MC Rittman. (Tr. 1397-1404.) He reported left knee pain and swelling for approximately one month. (Tr. 1398.) His physical examination showed: normal heart rate and rhythm; left knee pain when pressure was applied; tenderness with McMurray's testing; and a small suprapatellar effusion. (Tr. 1398-99.) Dr. Fracasso noted possible gout in the knee and prescribed prednisone. (Tr. 1401.) Mr. Lamson followed up with Sara M. Tokie, APRN-NP, at Dr. Fracasso's office on February 16, 2022, with left leg swelling. (Tr. 1407.) He denied chest pain (Tr. 1408), and his physical examination was normal throughout except for left leg swelling with 2+ edema, slight erythema in the left lower extremity, and tenderness to touch (Tr. 1410). APRN Tokie ordered a stat ultrasound. (Tr. 1411.)

On July 11, 2022, Mr. Lamson returned to see Dr. Fracasso and reported ongoing left knee pain with recent popping and locking. (Tr. 1417.) On physical examination, he displayed normal heart rate and rhythm, pulses in both feet, no edema on the right leg, tenderness with McMurray's testing, significant crepitus, and pain with patellar traction in the left leg. (Tr. 1417-18.) Dr Fracasso indicated a need for MRI testing of the left knee. (Tr. 1419.)

On August 16, 2022, Mr. Lamson underwent an MRI of the left knee. (Tr. 1174-81.) It showed an undersurface tear of the medial meniscus, a small joint effusion, no ligamentous insufficiency, and a small popliteal or Baker's cyst. (Tr. 1181.)

On September 6, 2022, at Dr. Fracasso's referral, Mr. Lamson underwent an orthopedic evaluation with Ryan Urcheck, M.D., at Summa Health Medical Group Orthopedics and Sports Medicine Medina. (Tr. 1136-42.) He reported ongoing left knee pain with catching and locking while working and with activities of daily living ("ADL's"). (Tr. 1136.) The pain was worse using stairs, rising from sitting, and walking; it improved somewhat with rest, ice, elevation, and Norco. (*Id.*) On physical examination, Mr. Lamson displayed: normal and symmetric range of motion in the hips; full, painless extension and rotation in the lumbar spine with negative same side and contralateral straight leg raise; tenderness to palpation in the left knee over the medial and lateral joint lines; full extension and 130 degree flexion in the left knee with moderate crepitus; intact sensation in the left leg; 2+ patellar and Achilles reflexes; 5/5 motor throughout the left lower extremity; and neutral alignment, mild effusion, and well-healed scars on the left knee. (Tr. 1139-40.) Dr. Urcheck reviewed knee x-rays from July 2022 and found no osseous abnormalities. (Tr. 1140.) He also reviewed the August 2022 MRI. (Tr. 1141.) He diagnosed tear of the left medial meniscus, and Mr. Lamson elected to proceed with surgery. (*Id.*)

On September 29, 2022, Mr. Lamson underwent left arthroscopy medial or lateral meniscectomy and meniscal shaving performed by Dr. Urcheck. (Tr. 1155; *see* Tr. 1151-72.) He attended a post-surgical evaluation on October 11, 2022, with Jennifer Ogorzolka PA-C. (Tr. 1271-74.) He reported minimal pain and swelling since surgery, and his gait was slightly antalgic. (Tr. 1271.) His incision was healing appropriately, and his physical examination showed notable quadricep atrophy, intact sensation, no motor loss, somewhat reduced range of

motion, and improved medial joint tenderness. (*Id.*) PA-C Ogorzolka recommended physical therapy and set a follow-up in four weeks. (Tr. 1272.)

On January 23, 2023, shortly after the December 2022 date last insured, Mr. Lamson attended a cardiology appointment with Dr. Redle to follow up on asymptomatic premature ventricular contractions ("PVC") that had been confirmed by an EKG. (Tr. 1510.) He had no palpitations, syncope, or near syncope and was exercising without restriction. (*Id.*) Dr. Redle diagnosed asymptomatic PVC, noting that Mr. Lamson retained normal left ventricular function, and recommended continued monitoring. (Tr.1513-14).

### 2. Opinion Evidence

On April 5, 2023, state agency medical consultant Leon Hughes, M.D., conducted a physical RFC assessment. (Tr. 231-32.) He opined that Mr. Lamson could: occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand/walk and sit for six hours in an eight-hour workday; occasionally push/pull with the left lower extremity; never crawl or climb ladders, ropes, or scaffolds; occasionally kneel, crouch, and climb ramps and stairs; and frequently balance and stoop. (*Id.*) He further opined that Mr. Lamson should avoid concentrated exposure to humidity and extreme cold or heat. (Tr. 232.) On December 18, 2023, J.V. Corcoran, M.D., affirmed Dr. Hughes's findings on reconsideration. (Tr. 240.)

## C. Hearing Testimony

At the hearing on June 10, 2024, Mr. Lamson testified in response to questions from the ALJ and his attorney. (Tr. 209-20.) A Vocational Expert ("VE") also testified. (Tr. 220-25.)

The VE testified that a hypothetical individual of Plaintiff's age, education and work experience, with the functional limitations described in the ALJ's RFC determination, could perform representative positions in the national economy, including sandwich maker, fry cook,

and cook's helper. (Tr. 222-23.) The VE also testified that it would preclude competitive employment if the person needed two or more additional, unannounced, unscheduled, 15-minute breaks throughout the workday on an ongoing basis, or if the person could only work five-hour days for a total of a 25-hour workweek. (Tr. 223-24.)

## III. Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant

work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy. *Id.*

## IV. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall

be conclusive[.]" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)) (alteration in original). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B. Sole Assignment of Error: A Medium RFC is Supported by Substantial Evidence**

In his sole assignment of error, Mr. Lamson argues that the RFC lacked the support of substantial evidence "because the ALJ failed to properly analyze objective medical evidence, opinion evidence, and Plaintiff's testimony" and the evidence "failed to support [the ALJ's] conclusion that Plaintiff retained the ability to perform medium work on a sustained basis."

(ECF Doc. 10, pp. 1, 7-8.) Specifically, Mr. Lamson challenges the ALJ's reliance on records that reference "Plaintiff's ability to perform certain activities of daily living and work activity" because the mere performance of those activities does not support an "ability to perform the rigorous demands of medium work on a sustained basis[.]" (*Id.* at p. 8.) The Commissioner responds that the ALJ did not rely on reported activities alone to support the medium RFC but considered multiple factors that included Mr. Lamson's objective examination findings, reported activities, and deferral of conservative treatment suggestions. (ECF Doc. 11, pp. 7-10.)

A claimant's RFC "is the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must assess the "residual functional capacity based on all the relevant evidence in [the] case record," *id.*, such as: medical history; medical signs and laboratory findings; effects of treatment; reports of daily activities; lay evidence; recorded observations; medical source statements; symptoms; evidence from attempts to work; need for a structured living environment; and work evaluations, *see* Social Security Ruling (SSR) 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34477 (July 2, 1996).

"The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)). Accordingly, an ALJ is "not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Id*. Even where an opinion was given great weight under prior regulation, the Sixth Circuit held "there [was] no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor [was] the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).

Here, the ALJ found Mr. Lamson capable of performing medium work with certain postural and climbing limitations (Tr. 165) despite severe impairments that included: coronary artery disease, status-post NSTEMI; degenerative disc disease with post-laminectomy syndrome, cervicalgia, and radiculopathy; and left knee degenerative joint disease (Tr. 164).

In support of the medium RFC, the ALJ discussed the treatment records in detail. As to degenerative disc disease, the ALJ noted that Mr. Lamson engaged in formal pain management and used pain medications, but also reported the medications were effective in controlling his pain and demurred on referrals for physical therapy and injections; he also noted that related physical examination findings were no more than "mildly adverse," noting mild limitations in range of motion, tenderness, and mild pain. (Tr. 165-66.) As to coronary artery disease, the ALJ acknowledged Mr. Lamson's May 2021 NSTEMI, cardiac catheterization, and stent placement, but also noted that his ejection fraction had normalized by September 2021, and that he was placed on a one year "return for consultation" schedule in March 2022, "an indicator of a medical condition under good control"; he also cited clinical exam findings in May 2021 and March 2022 that were "mildly adverse[] or benign." (Tr. 166-67.) As to degenerative joint disease, the ALJ acknowledged Mr. Lamson's left knee pain complaints beginning in January 2022 and his September 2022 meniscal repair but also noted that he reported minimal pain following surgery, returned for only a single post-operative visit, and submitted no evidence that he engaged in post-operative physical therapy as planned; he also noted abnormal clinical examination findings before surgery and normal examination findings a few months later. (*Id.*) Based on all the treatment records, as described, the ALJ concluded "that the symptom limitations relevant to these impairments are not as severe as alleged." (Tr. 168.)

In addition to the relevant medical treatment records, the ALJ considered Mr. Lamson's reported activities as follows:

> At one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in the claimant's testimony), the claimant has reported the following daily activities: the claimant maintains an independent household, attends to his personal care without issue, manages his own medications, finances and appointments. He attends to household chores, such as cooking and cleaning, drives, shops, engages in wood working for pleasure (4E), [hearing testimony]. A treatment note, in 2021, describes him as engaged in physical activities seven days per week for more than 150 minutes at a time (3F/4). Even after the date last insured, in January 2023, his cardiologist noted the claimant was exercising without restriction (11F/1). He is self-employed at twenty-five hours per week, performing contractor-like jobs such as painting apartments between tenants, repairing drywall, engaging in lawn work, renovating historic homes [hearing testimony], (13F/69). A treatment note, in 2022, describes him as doing construction work and remaining busy all day long doing activities (4F/1). Although that work activity did not constitute disqualifying substantial gainful activity, it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported. In short, the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. While none of these activities, considered in isolation, would warrant or direct a finding of "not disabled"; when considered in combination, they strongly suggest that the claimant would be capable of engaging in the work activity contemplated by the residual functional capacity.

(Tr. 168.) Thus, the ALJ did not only consider the activities Mr. Lamson reported in his function report and hearing testimony, but also the activities he described to his providers, including: engaging in physical activities seven days per week for more than 150 minutes at a time (*id.* (citing Tr. 990 (5/7/21 ER note))); exercising without restriction (*id.* (citing Tr. 1510 (1/23/23 cardiology note))); working "full time in construction type business," restoring older homes (*id.* (citing Tr. 1606 (1/26/21 pain management note))); and doing "construction work" and being "busy all day long doing activities" (*id.* (citing Tr. 1073 (3/22/22 cardiology note))).

The ALJ also described inconsistencies he noted between Mr. Lamson's subjective complaints and the contents of his treatment notes, as follows:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because treatment notes describe the claimant as able to continue working with treatment (2F/29), (9F/56). The claimant conceded the ability to lift fifty pounds without pain [hearing testimony]. He concedes treatment allows him to remain in self-employment and to work hard (13F/62). He has deferred treatment suggestions other than medications, including measures conservative, such as physical therapy, and measures more invasive, such as injections (2F/31).

(Tr. 168.)

The ALJ also considered the opinions of the state agency medical consultants, who concluded that Mr. Lamson could perform light work with postural and climbing limitations similar to those in the ALJ's RFC, as well as left leg and environmental limitations, and found the opinions "only marginally consistent with, and supported by, the overall evidence of record and . . . not persuasive." (Tr. 169.) In rejecting the state agency consultants' opined limitations to light exertional work with left leg and environmental restrictions, the ALJ explained:

> The record shows a claimant with spine disorders, but treating with medications only, and with sufficient success to allow him to continue self-employment in construction, and to remain busy all day long doing activities (4F/1), (9F/56), (13F/62). The claimant has coronary artery disease, but which has been stable and asymptomatic (4F/6), since the catheterization and stenting that normalized his left ventricular ejection fraction (4F/9). The claimant had surgical repair of a meniscal tear but reported minimal pain thereafter (8F/1) and did not return after his initial post-operative orthopedic appointment (8F/1-2). The claimant retains an array of activities of daily living of sufficient breath to encompass the maintenance of an independent household (4E), [hearing testimony], the ability to perform construction work and to remain busy all day long doing activities (4F/1), the ability to engage in physical activities seven days per week for more than 150 minutes at a time (3F/4), the ability to perform lawn work [hearing testimony], to lift fifty pounds without pain [hearing testimony], to engage in exercise without restriction (11F/1). By comparison to this evidence, these opinions understate the claimant's exertional capacity. The very brief post-operative period for the claimant's knee, and return of full strength, neurological function, and gait (8F/2), indicates there is no need to restrict use of pushing/pulling, or using foot controls. The records of a neck and lumbar spine disorder justifies restriction to occasional, but not the complete preclusion of crawling. The claimant's work outdoors [hearing testimony], does not support restriction against weather conditions such as humidity, excessive heat or cold.

(*Id.*)

In support of his challenge to the ALJ's finding that he can perform medium work, Mr. Lamson asserts that the ALJ relies "primarily" on general references to Mr. Lamson's ability to perform activities of daily living and work activities and argues that these reported activities are inadequate to support a medium RFC because his reported ability to perform part-time work "is inconsistent with the ability to sustain medium work *on a regular and continuing basis*." (ECF Doc. 10, pp. 8-9 (emphasis added).) Plaintiff is correct that a "regular and continuing basis" means "8 hours a day, for 5 days a week, or an equivalent work schedule," SSR 96-8p, 61 Fed. Reg. at 34475, which is not consistent with part-time work. (*See* ECF Doc. 10, p. 9.) But the Commissioner is correct that "the ALJ properly considered *several pertinent factors* in determining that Plaintiff's allegations were not consistent with the record" (ECF Doc. 11, p. 9 (emphasis added)), not only Mr. Lamson's report that he performed part-time work.

As discussed above, the ALJ considered Mr. Lamson's treatment of his spine impairment with medication alone, his limited treatment following an N-STEMI and knee surgery, his largely benign clinical findings, and his reports to providers that he was engaging in physical activity seven days per week for more than 150 minutes at a time, exercising without restriction, working full time in construction, and keeping busy all day long doing activities, including construction work. Thus, the ALJ did not simply rely on Mr. Lamson's reported part-time work in finding him capable of performing medium work. He also considered his conservative treatment, his "mildly adverse" clinical findings, his limited follow-up after more significant procedures, and his reports to providers of significant, ongoing physical activity. In this context, the Court finds Mr. Lamson has not met his burden to demonstrate that the ALJ's RFC finding lacked the support of substantial evidence. *See Blakley*, 581 F.3d at 406 ("'The substantial-

evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'") (citation omitted) (alteration in original).

Mr. Lamson's observations that the state agency consultants "found [him] limited to light work" and that "there is no other opinion statement contained in the record" do not change the Court's analysis. (ECF Doc. 10, pp. 9-10.) As discussed above, the ALJ analyzed the persuasiveness of the of the state agency opinions and explained his reasons for finding the opinions "only marginally consistent with, and supported by, the overall evidence of record and . . . not persuasive." (Tr. 169.) This finding was within the ALJ's discretion, as "[t]he responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Poe*, 342 F. App'x at 157 (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)). The ALJ was not required to adopt the limitations of the state agency consultants, *see Reeves*, 618 F. App'x at 275, and he was not required to "get the opinion of another physician before setting the [RFC]," *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018). Indeed, the Sixth Circuit has "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." *Id.* at 401-02 (citing *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-43 (6th Cir. 2017) *and Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)). Here, the ALJ adequately explained his reasons for finding the state agency opinions "not persuasive," and was not obligated to obtain further opinion evidence before exercising his discretion to determine Mr. Lamson's RFC.

For all of the reasons set forth above, the Court finds that the ALJ adequately explained his reasons for adopting a medium exertional RFC, and further that Mr. Lamson has not met his burden to show that the RFC finding lacked the support of substantial evidence.

Accordingly, the Court finds the sole assignment of error lacks merit.

## V. Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's final decision.

September 22, 2026

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge